The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention where the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Mr. Wood? Mr. Wood? Oh, I'm sorry, yes. Sorry, no, that's my mistake. The Court is ready. Good morning. My name is Pete Wood and I'm from Raleigh. And I represent Leroy Moore in his appeal of his conviction. He pled guilty and he preserved the right to appeal the motion to suppress, which was initially denied by the Magistrate and then in turn denied by Judge Flanagan at district court level. So this is a very narrow issue. It involves a traffic stop and a subsequent search. And I'm only concerned with the manner of the roadblock that stopped him and whether or not that passes constitutional muster, which happened after the roadblock. I think law enforcement was perfectly within their rights to search Mr. Moore. So if the initial stop is okay, then everything found after that stop is okay. But I'm arguing that the stop was not okay. So what happened was on July 1, 2014, the Whiteville Police Department and the Columbus County Sheriff's Department of Eastern North Carolina decided they were going to conduct a roadblock. And the facts of this are rather vague. Two people testified during the suppression hearing, Deputy Kennedy and then Sergeant Gore. Sergeant Gore ran the roadblock and he actually set up the parameters for it. They decided earlier that evening that it was a slow night and they decided they wanted to have a roadblock to check for traffic violations, Chapter 20 in North Carolina. This is a legitimate use of a roadblock. This is a small litany of things that the U.S. Supreme Court has found acceptable to use for a roadblock. This is about people for illegal immigration, drunk driving, and routine driver's license and registration checks. So that is a legitimate purpose. The deputy and the sergeant at the hearing were not very clear about when this roadblock started or exactly how many people it stopped. What we do know is it started between 1 and 2 in the morning and it ended with the arrest of Mr. Moore at 145. It is really unclear from the testimony of the two how many vehicles it stopped. Deputy Kennedy said, I'm not sure. And then the defense attorney for Mr. Moore said, well, is it possible you didn't stop any vehicles? What day of the week was it? You know, I'm not sure. I'm honestly not sure. I'm very sorry. But then the defense attorney says, is it possible you stopped no vehicles? And Deputy Kennedy said, well, yeah, that's extremely possible. But once again, he didn't say that for certain. He just didn't know. Well, how could that be? I mean, your client was stopped, so somebody was stopped, right? Well, he was stopped. So what are you saying? Can you clarify that? What I'm saying is that the two officers that testified in the suppression hearing were not quite clear how long the roadblock operated or how many vehicles it stopped. They're not clear. All we know for certain is that it was on July 1 and it stopped at 145 in the morning. Exactly when it started, we're not certain about that. It went from 1 to 2. Well, but that was sort of a range. But then they said that he was arrested at 145 and then Sergeant Gore testified. At that point, we didn't have enough manpower to run the roadblock, so we stopped it. Everybody went home and we processed Mr. Moore. Was everyone stopped that went to the traffic checkpoint? Well, I'm not certain because they're not sure how many people they stopped. Well, there's no evidence in the record that they did not stop everybody. Isn't that correct? It's not clear either way. Either there's testimony to that effect or there's not. Right. And so which was it? I don't know how many people they stopped, but they did say that their intent was to stop everybody. So I see no reason to think they waved anybody through. So what exactly are you objecting to with respect to the stopping so that we can cut to the chase here? I'm objecting to the vagueness of the plan that was set up and the fact that Sergeant Gore ran the stop, that Sergeant Gore had too much discretion. And effectively what happened was that it was a stop without clear parameters, and as soon as they arrested Mr. Moore, they stopped it. Well, they had to stop it at some point. So, I mean, what are you saying? Why is that problematic, particularly if there's no evidence in the record that they didn't stop everybody before then? Because it amounts to a fishing expedition where basically what they're doing is they're saying, we're going to have to stop until we get somebody for a large amount of drugs or some major crime, and then we're going to stop it. I would submit— So do you have a case that says that officers have to continue to stop after they find the big fish, as you've described it? No, I don't. There's not a lot of case law on this, and I think that you would be creating that law. I do not have a case that says that. What I do have is cases that sort of give these ranges of acceptable constitutional muster that roadblocks must pass. I mean, on the one extreme, you have Prowse v. Delaware where there's no roadblock at all. The police are conducting random traffic stops to look for registration. No, it's not. But that's the one extreme. That's not okay. On the other extreme, you have Martinez-Fuertes, which is a U.S. Supreme Court case where there was a permanent checkpoint in Texas, and it stopped everybody. And to me, that seemed to operate almost like customs. What I can gather from the evidence, from the opinion, is that this checkpoint had set business hours every day. It stopped everybody. Did they detain anybody past the point when a legitimate, valid driver's license was shown and the registration was produced and whether the driver was permitted to go on their way? They may have, but from the record, we can't discern that. Well, I know, but see, the thing is, you have the burden. Oh, sure. I mean, you say they may have. You know, frankly, it's your job to crystallize that evidence because you're the one that is bringing the motion to suppress. Yes. And you've got to, you know, if there's a way in, if there's a fallacy in this roadblock and the checkpoint, you have the burden of illustrating that. Absolutely. And what I would say is that the problem with the roadblock is it does not have a firm set of criteria. So it does not have firm operating procedures. Well, the Supreme Court doesn't require a written plan for a roadstop, does it? It, there's no case that directly says that, but it dictated at the end of Krause v. Delaware, they talk about how roadblocks would be acceptable if they were operating under standard procedures, which would involve, you know, being clearly marked, stopping everybody, no discretion by the police, and I would submit. Is there any evidence in the record those three factors were violated? The one thing I'm talking about is, okay, first of all, there's no question the roadblock had a legitimate purpose. Registration, licenses, that's okay. No question that it was clearly marked. No issue with that either. My only issue is that the roadblock did not have operating hours. And I find that somewhat problematic that Sergeant Gore alone could decide, all right, this is the end of this. We're shutting this down. Just because there's a roadblock which looks okay doesn't mean that it passes constitutional scrutiny. I mean, if you think about it, maybe an example of a roadblock that would not meet this would be, suppose if the police knew that somebody drove a certain route home every day at a certain time and set up a roadblock near his house and it looked like it was acceptable, it was well marked, it had the stated purpose of looking for registration and driver's licenses and mistakes, but as soon as they pulled over the man they knew would be going down that route, they shut the roadblock down. That would not be okay. We can all agree on that. Well, it might be a legitimate reason for that. They were shorthanded and they had to take the guy in and book him. Well, but I would submit that it would still be the duty of the police to operate the roadblock under clear rules and follow those rules and part of that would be to set up a definite beginning time and a definite end time. You know, some of these Supreme Court cases don't directly touch on this, but like Indianapolis versus, the name escapes me right now, but that was a case where they held that a roadblock was not okay because it was for general purpose in Indianapolis of finding lawbreakers. It was not looking for DWIs, it wasn't looking for registration and licensing mistakes and the purpose wasn't okay, but the roadblock seemed to be okay and the roadblock had pretty definite rules including definitely how long it would operate and the way that one operated was we stopped 30 cars, we pulled them over, we're done with the 30 cars, we closed down the roadblock. So that one had a definite beginning and ending time. Sergeant Gore and Deputy Kennedy though in their testimony just can't really state exactly what the rules are for the roadblock. One of the rules was Sergeant Gore ordered the officers to stop every car that came through, right? Yes. Were those rules violated? I see no evidence that they violated those rules. This is a very narrow issue I'm arguing here. My only issue is that by not having a definite plan in place and by not having a definite starting and ending time to the roadblock, But as Judge Floyd points out, they may have been shorthanded. There may have been other emergencies that required their attention. Maybe the officers just wanted to get some sleep. We all get tired after a certain point. Sure. And the very fact that there's a traffic checkpoint for a limited amount of time, the word gets around to the community and people tend to drive a little bit more safely and not to have as much to drink at that hour in the morning. The word gets out that the police are running a traffic checkpoint and people don't take that extra drink. Oh, I agree. A traffic checkpoint could be an excellent deterrent effect, illegal activity. I'm with you 100% on that. But I don't know that being short of manpower is an excuse for not following the Constitution. That would be my argument. I mean, if the police are short of manpower, they still have to follow the Fourth Amendment. You can't go kicking down doors because you're short on staff. But I come back to Judge Diaz's question. What is it exactly that you're complaining about? I mean, I don't understand. Because they stopped everybody, as far as I can tell. They didn't detain people past the point of asking for a driver's license and registration. The cones were out. The blue light was out. So between the cones and the blue light, you had a chance. Motorists had a chance to see the checkpoint and slow down. And it was of limited duration. You say, well, they abandoned the checkpoint at 1.45. I mean, what do you want them to do? Run it from 1 to 3 in the morning? Then you'd have greater cause come up in. You'd say, well, this went too long. Checkpoints should be for a limited time. That's what this one was. It would seem to me, from a standpoint of a Fourth Amendment enthusiast, the fact that it was for a limited time and didn't just drag on and on and on with personnel changes and all the like would be a good thing. Rather than otherwise, we don't want an opinion that says, if you stop a traffic checkpoint after a relatively short, limited time, you're committing a constitutional violation. That can't be the rule because that encourages more intrusiveness. So I'm out of time. Should I answer the question? No, you can save the time and answer it on rebuttal if you would. Okay? Okay. Ms. Rips, do you want to start? You've heard the panel's comments and questions. Just tell us what you have to add. I think that based on this court's comments and questions, you clearly understand the issues that are at play here. This was a constitutional stop. It was reasonable in all respects, and the defendant has not maintained its burden to show otherwise. We would rest on the arguments in our brief, unless this court has specific questions. Well, I have one. So what does the record say about what the supervisor in this case determined as the beginning and end point of the traffic roadblock, if any? The report that he had filled out indicated that it was from about 1.30 to 2.30. Well, that's how it went down. But was that how it was set up beforehand? I think that what occurred in this case is that the officers were being proactive about public safety, and they picked a time to convene so that they had adequate manpower to conduct the stop. But they didn't pick any determinative stopping point, any specific stopping point. No, they hadn't decided in advance that the checkpoint would be for a specific duration. Is there anything wrong with that? No, there isn't, not in this case. And I will point out that the example that opposing counsel provided, where there would be a pretextual stop just to get somebody traveling on a bus, wasn't what happened here. And, in fact, I would direct the court to the magistrate judge's interaction with defense counsel on pages 120 to 121, where the magistrate judge said, you know, it would be very disconcerting if this were a stop that were set up for 10 minutes and it was apparent that the primary purpose was to get a particular person.  And he found that that wasn't supported by the record here. What we had here were officers who were being proactive about public safety, who are in a rural county, and who decided that an effective use of their time on the night shift would be to conduct a traffic checkpoint. And, Judge Wilkinson, in response to your question about the day, it was Monday night going into Tuesday morning. And, ultimately, these officers were diligent. They made sure that the stop was visible. It was on a straightaway of a main road going through the county seat. There was some traffic, but not so much traffic that there would be accidents or a backup. And it was also located in a way that would allow these officers to respond. Are these stops safer as a general rule if they take place where there's relatively less traffic? I mean, I would think that the later they take place, the more inebriated drivers there are. So I can see it cutting both ways. I was just interested in that. That is a fair point. And I will say that in this particular case, the officers distinguished their policies and procedures for DUI sobriety checkpoints and the standard license and registration checkpoints. They indicated that other things were involved in the DUI checkpoints. And it was a more collaborative effort with different agencies so that they could have the blood alcohol machine present and all that. I think that in terms of the time, I would agree that there might be a greater likelihood of finding people who are under the influence. But, again, the primary purpose of this checkpoint was license and registration and general compliance with the Chapter 20 motor vehicle rules. And we ultimately think that this court should uphold the district court's determination that the procedure followed here struck a reasonable balance between advancing North Carolina's interest in enforcing motor vehicle laws and the liberty interest of motorists. Well, let me ask my colleagues if they have questions of you. Judge Diaz? Thank you very much. Thank you. Mr. Wood, do you have some rebuttal time? Yes, I do. Thank you. So in answer to the question about Judge Wilkinson, the issue with the end time is that it gives unfettered discretion to the police about when to stop instead of having a firm set of rules, which goes back to Proust v. Delaware. Whenever it ends, it's a matter of discretion on the part of the officers as to whether they want something that's relatively long or relatively short. I don't understand exactly how the duration of one hour versus two hours or whatever is constitutionally dispositive. Because if you set it up ahead of time, then the unfettered discretion doesn't come in. The unfettered discretion comes in when you apply it to a particular person. Whether or not, as in Proust v. Delaware, you're pulling somebody over randomly or you're using discretion to pull them over as opposed to either reasonable suspicion, probable cause, or a firm set of criteria as in a roadblock. So that would be my response to that. Also, just in response to my colleague's comment about the example I gave of the police targeting somebody because they knew when he was arriving home, that did not happen in this case. My point is that that would be an extreme and that would not pass constitutional scrutiny. I think maybe the example of a roadblock done well, done the best, would be Martinez-Fuerte, where it's a permanent roadblock, it's well marked, every car stopped, it has a definite purpose. There's no question there that they're shutting down early or anything. It has regular operating hours. So to me, that's probably the standard. And the worst way to conduct it would be Proust v. Delaware, where you're just picking that car at random. That's way too much discretion. No discretion, too much discretion. This case falls somewhere in between. There's not case law directly on point, so that's where the Honorable Court of Appeals comes in, is that they can maybe elaborate and set some guidelines there. But it's my argument that part of having definite rules to take away discretion is having a definite begin time and a definite end time. All right. Thank you, sir. Thank you, and thank you for allowing me to appear before you. Thank you very much. We'd like to come down and greet counsel, and then we'll proceed directly into our next case.
judges: J. Harvie Wilkinson III, Albert Diaz, Henry F. Floyd